IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ARTHUR HENDERSON, III, | ) | Case No. 1:19-cv-2913 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Arthur Henderson, III, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).[1]  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, and because Henderson has not met his burden to show that a Sentence Six remand would be proper, I recommend that the Commissioner's final decision denying Henderson's applications for DIB and SSI be AFFIRMED.

---

[1] On December 18, 2019, Chief Judge Patricia Gaughan entered a differentiated case management order for administrative track cases reflecting the automatic referral.  ECF Doc. 3.

## II.    Procedural History

Henderson applied for DIB and SSI on May 29, 2015.  (Tr. 212-24).[2]  Henderson alleged that he became disabled on June 23, 2014, due to depression, high blood pressure, ADHD, lower back pain, anal fissure, bipolar disorder, carpal tunnel in his right hand, sleep apnea, and arthritis in both hands.  (Tr. 212, 219, 302).  The Social Security Administration denied Henderson's claims initially and upon reconsideration.  (Tr. 78-150).  Henderson requested an ALJ hearing. (Tr. 168-69).  ALJ Joseph Rose heard Henderson's case on July 5, 2017 and denied the claims in a November 17, 2017 decision.  (Tr. 16-55).

On February 1, 2019, Henderson sent the Appeals Council a 6-page fax, indicating that he had filed an appeal on January 18, 2018 and including a copy of his appeal form and a certified mail return receipt dated January 19, 2018.  (Tr. 206-08).  Henderson's communication stated, "My apologies for the incorrect Social Security number on the letter.  It is correct on these submissions."  (Tr. 206).  A January 16, 2018, letter included in the faxed documents indicated that Henderson had enclosed with his appeal updated records from MetroHealth Medical Center and asked that those records be considered on appeal.  (Tr. 209).  On March 12, 2019, Henderson sent a fax to the Appeals Council (listing an incorrect Social Security number), stating:

> Pursuant to your telephone call, I have checked my file regarding the MetroHealth Medical Center records.  It appears that, because there were over 300 pages of records, I did not retain a copy.  The originals were submitted with the appeal to the Appeals Council.  With your permission, I will request them again.

(Tr. 7).  On November 13, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  The Appeals Council's decision did not address Henderson's updated records or his letter indicating that updated records existed.

---

[2] The administrative transcript appears in ECF Doc. 12.

*See* (Tr. 1-6).  On December 18, 2019, Henderson filed a complaint to obtain judicial review from this court.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Henderson was born on October 27, 1982, and he was 31 years old on the alleged onset date.  (Tr. 212).  Henderson had a high school education, and he had an IEP during school.  (Tr. 42, 303, 736).  Henderson also had past work experience as a construction laborer, and he received on-the-job training through his union.  (Tr. 39-40, 303).

### B.    Relevant Medical Evidence

On June 11, 12, and 16, 2014, Henderson went to the emergency room for treatment of a gluteal abscess.  (Tr. 381, 474, 483, 581).  On June 11, 2014, Henderson reported a pain level of 10 out of 10 and said that his pain was sharp, constant, and throbbing.  (Tr. 381).  He also reported having a fever and sweating.  (Tr. 383).  On physical examination, Henderson had normal, intact, warm, and dry skin; he was in no acute distress; and he had no noted symptoms in his extremities, respiratory system, or cardiovascular system.  (Tr. 383-84, 581-82).  He was diagnosed with gluteal abscess and given Keflex and Vicodin.  (Tr. 383-84).  On June 16, 2014, Henderson said that his hips had become progressively worse and that he had fallen on the area, causing swelling.  (Tr. 474, 483).  Examination again showed normal, intact, warm, and dry skin; no acute distress; and normal extremities, range of motion, respiration, cardiovascular function, neurological function, and psychiatric function.  (Tr. 474-75).  Attending physician Larry Glaude, MD, also noted that Henderson's abscess had improved.  (Tr. 475, 483-84).  Dr. Glaude referred Henderson to John Jasper, MD, for follow-up treatment.  (Tr. 483-84).

On June 24, 2014, Henderson saw Dr. Jasper for surgery.  (Tr. 390).  Dr. Jasper noted that Henderson continued to have "bloody/pus drainage and pain" from his gluteal abscess.  (Tr.

3

390).  He also noted that Henderson had sleep apnea and hypertension, but he did not have a CPAP.  (Tr. 390).  Examination on June 24 and June 25, 2015, showed that Henderson was well developed, in no distress, had normal cardiovascular and respiratory function, had intact range of motion, had 5/5 motor function, and had warm/dry skin without rashes.  (Tr. 391, 613, 653).

On September 30, 2014, Henderson told Joseph Daprano, MD, that he had pain all over his body, popping in his right knee, weight loss, and hand pain.  (Tr. 460).  He also said that he believed he had another abscess that was untreated, felt fatigued since starting doxycycline for the infection, and thought he might have HIV.  (Tr. 460).  Examination showed that Henderson was alert and interactive, had a normal right knee, had full range of motion, and had full motor strength.  (Tr.460-61).  Dr. Daprano also noted that Henderson's abscess looked "well healed," he was able to balance, and he was able to tandem walk.  (Tr. 460-61).  Dr. Daprano also noted that he had previously referred Henderson to ortho for his hand pain, but Henderson no-showed the appointment.  (Tr. 461).

On October 2, 2014, Henderson again went to the emergency room for a left gluteal abscess with pain and tenderness.  (Tr. 506).  He rated his pain as a 5 out of 10.  (Tr. 519).  Dr. Glaude noted that, at the end of treatment, Henderson "ambulated easily out of ED."  (Tr. 519).

On January 9, 2015, Henderson told Dr. Daprano that his back and right knee hurt, he needed surgery for his gluteal abscess, and he was losing weight.  (Tr. 445).  He asked for pain medication.  (Tr. 445).  On examination, he was alert, his right knee was normal, and he had full range of motion.  (Tr. 445).  At follow-ups on February 24 and March 31, 2015, Dr. Daprano noted that Henderson continued to report right knee and back pain and he had impaired glucose tolerance.  (Tr. 437, 440).  Henderson said that he had seen "Dr. Bosio" for surgery to address his gluteal abscess and he was told that he had an anal fistula possibly related to Crohn's disease.

(Tr. 437, 440).  Examinations showed that Henderson had spurring in his patellar tendon.  (Tr. 437, 440).  Dr. Daprano also encouraged Henderson to have a psychiatric evaluation.  (Tr. 437, 440).  On February 5, 2015, Dr. Daprano noted that Henderson had a sleep study, which showed that he had sleep apnea.  (Tr. 442).  Dr. Daprano noted that Henderson needed to call to see if he needed a follow-up appointment to determine the pressure needed for a CPAP or if he could proceed to get a CPAP directly.  (Tr. 442).  On February 18, 2015, Henderson called and said he was upset that he had a sleep study but was not able to return for a follow-up CPAP fitting.  (Tr. 442).

On January 18 and June 1, 2015, Henderson again went to the emergency room for his gluteal abscess and rated his pain as a 7 out of 10.  (Tr. 521, 550).  Examinations again showed that he was in no acute distress; was alert and oriented; and had normal breathing, skin, and cardiovascular function, and musculoskeletal function.  (Tr. 522, 524-25, 551, 553-54).  Medical records indicated that Henderson had prediabetes.  (Tr. 524).

On February 11 and 25, 2015, Henderson saw Carvell Nguyen, MD, for treatment of erectile dysfunction.  (Tr. 718, 723).  Henderson denied having any chronic back pain, arthritis, or neck pain.  (Tr. 719, 724-25).  On examination, he had normal nutrition, no deformities, regular heart rate, normal gait, normal reflexes, normal sensation, normal affect, normal extremities, normal range of motion, and intact strength.  (Tr. 719, 725).

On March 30, 2015, Henderson saw Joseph Golish, MD, for his sleep apnea.  (Tr. 712).  Dr. Golish noted that Henderson slept for 4 to 5 hours per night and had difficulty sleeping.  (Tr. 712).  Examination showed no apparent distress, clear lungs, normal heart, soft abdomen, and no noted symptoms in his extremities.  (Tr. 714).

On April 24, 2015, Henderson told Vladimir Kiselev, MD, that he had a chronic boil or fistula on his left buttock.  (Tr. 706).  Henderson said that he had "mild" pain in his perianal area

and denied any pain or blood with bowel movements.  (Tr. 706).  On examination, Henderson

had no distress, normal extremities, and an external opening fistula with no drainage.  (Tr. 708).

Dr. Kiselev noted that Henderson's fistula did "not require urgent surgical intervention" and

referred Henderson for further evaluation.  (Tr. 708).

On May 22, 2015, Henderson complained of low back pain and hand pain.  (Tr. 425).

Dr. Daprano noted that Henderson had not gone to an ortho hand appointment.  (Tr. 425).

Dr. Daprano also noted that Henderson had an upcoming colorectal surgery.  (Tr. 425).  On

examination, Henderson had full motor function, and he was alert and oriented.  (Tr. 426).

Henderson also reported depression and Dr. Daprano again referred him to psychiatry.  (Tr.

425-26).

On June 5, 2015, Jeremy Lipman, MD, noted that Henderson reported having an abscess

and that an MRI showed he had a fistula.  (Tr. 696).  Henderson said that he had drainage 3 to

4 times per month, treated his abscess with sitz baths, had three bowel movements per day, and

did not have any blood in his stool.  (Tr. 696).  Examination showed no distress, clear lungs,

regular heart rate, warm extremities, no edema, normal gait, and intact sensation.  (Tr. 697-98).

Henderson had an external opening fistula, but no cellulitis or purulence.  (Tr. 698).  Dr. Lipman

scheduled Henderson for a fistulotomy or seton placement.  (Tr.698).  On July 27, 2015,

Dr. Lipman performed surgery to resolve Henderson's anal fistula.  (Tr. 686).  Dr. Lipman noted

that the fistula was found and drained.  (Tr. 686-88).  Henderson was stable at the end of surgery.

(Tr. 688).  On October 8, 2015, Henderson reported "doing well" and having significantly

improved pain.  (Tr. 772).  On October 27, 2015, Henderson reported to Dr. Lipman that he had

a new abscess on his buttock.  (Tr. 772).  Dr. Lipman saw Henderson in clinic and recommended

drainage, but Henderson declined.  (Tr. 772).  Henderson told Tameka James, CNP, that he had

pain with movement and sitting, and felt like his "tract was spreading" and felt pressure and pain

outwardly.  (Tr. 771).  On examination, Nurse James noted that there was an abscess with fluctuance and drainage, but no cellulitis.  (Tr. 772).  On October 30, 2015, Dr. Lipman noted that there was continuing drainage and an external opening of Henderson's fistula, and he discussed a seton placement.  (Tr. 771).  On December 3, 2015, Dr. Lipman noted that Henderson continued to have perianal drainage but said that he felt "a bit better."  (Tr. 768).  Dr. Lipman planned a seton placement or fistulotomy.  (Tr. 768).  Dr. Lipman performed the surgery on January 11, 2016.  (Tr. 789).

On October 8, 2015, Dorothy Bradford, MD, conducted a physical examination on referral from Opportunities for Ohioans with Disabilities.  (Tr.747-54).  Dr. Bradford noted that Henderson reported arthritis in his hands, hand cramps, relief with over-the-counter medication, and low back pain.  (Tr. 752).  Henderson said that it was hard to bend or sit too long.  (Tr. 752).  Dr. Bradford noted that Henderson was capable of normal activity and he reported mood swings.  (Tr. 752).  Dr. Bradford found that Henderson had full range of motion in all of his extremities, normal grasp, normal manipulation, normal pinch, and normal fine coordination.  (Tr. 747-50, 754).  Examination of the lumbar spine showed normal vertebral body heights and well-maintained disc space heights.  (Tr. 751).  He had a normal gait, normal posture, normal station, and normal strength and tone.  (Tr. 754).

On November 12, 2015, Dr. Daprano noted that Henderson had still not gone to an ortho hand appointment despite reporting paresthesias in his hand.  (Tr. 759, 769).  Examination showed that Henderson was alert and oriented, and he had no noted issues in his extremities.  (Tr. 759, 769).  Dr. Daprano also recommended that Henderson seek psychiatric treatment.  (Tr. 759, 770).

### C.  Henderson's Function Reports

On June 22, 2015, Henderson completed a "function report" detailing his activities and limitations.  (Tr. 311-18).  Henderson said that he spent his day watching TV and playing games on his phone.  (Tr. 312).  He said that he was responsible for taking care of his dog, and his kids helped him.  (Tr. 312).  Before the onset of his alleged disability, Henderson said that he was able to "bend faster[ and] move hands better without cramping."  (Tr. 312).  He did not need reminders to take care of his personal needs or take his medicine.  (Tr. 313).  He prepared his own meals daily.  (Tr. 313).  He did laundry, did all household chores at times, and sometimes had his kids do his chores.  (Tr. 313).  Henderson said that he often went outside, drove, and shopped in stores.  (Tr. 314).  He could pay bills and handle a savings account.  (Tr. 314).  His hobbies included being with his kids.  (Tr. 315).  He often watched movies, went to the park, and walked.  (Tr. 315).  He did not need reminders to complete tasks and he did not need someone to accompany him when he went out.  (Tr. 315).  He could walk "far" before needing to stop and rest, he could pay attention long "enough to know what's going on," he "sometimes" followed written instructions, and he followed spoken instructions "a lot."  (Tr. 316).  Henderson said that changes bothered him, and he had difficulty getting along with authority figures and other people.  (Tr. 317).

On April 19, 2016, Henderson completed a "disability report," in which he stated: "I can't bend over as quickly and it has gotten worse since the very first surgery in 2014 in which I was given an epidural shot in my back and it hurts even more."  (Tr. 346-53).

### D.  Relevant Opinion Evidence

#### 1.  Examining Psychologist – Natalie Whitlow, Ph.D.

On September 16, 2015, Natalie Whitlow, Ph.D., conducted a clinical interview of Henderson on referral from the Ohio Division of Disability Determination.  (Tr. 735-45).

8

Henderson told Dr. Whitlow that he would "flip out" on people at work, his boss, his family, and people "in the streets." (Tr. 736). He also said that he had anxiety, did not sleep, and felt like a "zombie" when going to work. (Tr. 736). Henderson said that he had depression at times, and that he had ADHD and had been on an IEP in school. (Tr. 736). Henderson denied having any physical conditions that prevented him from working, but also noted that he had carpal tunnel in his hands and back and pain in his buttocks. (Tr. 737). Henderson said that he smoked a quarter ounce of marijuana per week to minimize his physical pain and calm down. (Tr. 737). Henderson also said that he had variable income from his work, but he earned about $2,500 per month. (Tr. 738).

On examination, Henderson was groomed, maintained appropriate eye contact, was cooperative, was irritable and unfriendly, and had coherent communication. (Tr. 739). He had a depressed and irritable mood and inappropriate affect. (Tr. 739). He did not have any anxiety symptoms outside the normal range. (Tr. 739). He was oriented. (Tr. 739). He appeared to have low cognitive functioning based on his documentation, self-reporting, and his examination answers. (Tr. 740). He had fair insight and poor judgment. (Tr. 740). Dr. Whitman determined that Henderson had severe bipolar I disorder. (Tr. 740).

Dr. Whitman opined that Henderson would have difficulty with workplace decision-making, impulse control, anger, behavior management, interpersonal interaction, and complying with directives. (Tr. 741). He did not appear to have limitations in understanding, remembering, and carrying out instructions. (Tr. 742). He had difficulty staying on task, completing tasks, focusing, concentrating, and managing multiple thoughts. (Tr. 742). Dr. Whitman said that Henderson would have limitations responding appropriately to supervision and coworkers in a work setting. (Tr. 742). Dr. Whitman also said that Henderson would have limitations in

responding appropriately to work pressures due to his anger, aggression, impulse control issues, and poor decision-making.  (Tr. 743).

On February 24, 2016, Dr. Whitman conducted another evaluation.  (Tr. 793). Henderson again reported that he had mood swings and was fired from his previous job because he "flipped out" at work.  (Tr. 794).  Henderson said that he had unhealthy sleep patterns, racing thoughts, excessive worry, and fluctuating eating patterns and weight.  (Tr. 796).  Henderson said that he was able effectively manage his finances and could take care of his family and five children.  (Tr. 796).  On examination, Henderson had normal speech, inappropriate thought processes due to rage and anger, aggressive and irritable affect and mood, no anxiety, full orientation, average to low cognitive functioning, fair insight, and poor judgment.  (Tr. 796-97).

Dr. Whitman opined that Henderson would have difficulty with workplace decision-making, impulse control, anger and behavior management, interpersonal interactions, and complying with directives.  (Tr. 799).  She said that Henderson would have limitations in understanding, remembering, and carrying out instructions.  (Tr. 799).  He had limitations in maintaining attention, concentration, persistence, and pace to perform simple and multi-step tasks.  (Tr. 800).  He had limitations in responding appropriately to supervision and coworkers. (Tr. 800).  And he had limitations in responding appropriately to work pressures in a work setting.  (Tr. 800).

## 2.    State Agency Consultants

On October 5, 2015, state agency psychology consultant Carolyn Goodrich, Ph.D., evaluated Henderson's mental function based on a review of the evidence in the record.  (Tr. 87-91).  Dr. Goodrich determined that Henderson had mild restrictions in his daily living activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace.  (Tr. 87).  Dr. Goodrich said that Henderson did not have

any understanding and memory limitations.  (Tr. 90)  Henderson had no significant limitations in carrying out short, simple, and detailed instructions; maintaining an ordinary routine without special supervision; making work-related decisions; asking simple questions or requesting assistance; maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; being aware of normal hazards; taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making independent plans.  (Tr. 90-91)  He was moderately limited in maintaining attention and concentration; performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; working in coordination with or in proximity to others; completing a normal workday and workweek without; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instruction and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting.  (Tr. 90-91)  On February 29, 2016, Juliette Savitscus, Ph.D., concurred with Dr. Goodrich's opinion, except that she determined Henderson also had moderate limitations in understanding and remembering detailed instructions.  (Tr. 122-23, 126-27).

On October 14, 2015, state agency physical consultant Rannie Amiri, MD, determined that Henderson did not have any severe physical impairments based on her review of Henderson's medical records.  (Tr. 87)  On January 26, 2016, Leanne Bertani, MD, determined that Henderson could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push and/or pull without limitation.  (Tr. 124)  Dr. Bertani determined that Henderson could frequently climb rams/stairs and crawl; he could occasionally climb ladders, ropes, and scaffolds;

and he was unlimited in balancing, kneeling, and crouching.  (Tr. 125).  Henderson did not have

any manipulative, visual, communicative, or environmental limitations.  (Tr. 125).

###### E.  Relevant Testimonial Evidence

At the outset of the ALJ hearing, the ALJ noted that he had "records through 12F" (the

last set of medical records in the administrative transcript) and asked Henderson's counsel if

there were any questions about the records.  (Tr. 37).  Counsel said "No."  (Tr. 37).

Henderson testified at the ALJ hearing.  (Tr. 38-51).  Henderson said that, at the time of

the hearing, he had been working full-time as a cook at Fairview Hospital for 90 days.  (Tr. 38,

41).  He said that he enjoyed his job, he was responsible for cooking all parts of the menu and he

could cook off-menu.  (Tr. 39).  Henderson said that he got the job after he applied for it on the

computer.  (Tr. 41).  Henderson said that he had previously worked in construction in 2015, but

his boss had asked him to leave and his physical problems interfered with his ability to work.

(Tr. 39-40).  In his construction job, he had to use machinery (such as jackhammers) and drive

things.  (Tr. 40, 43).  He also did cleaning work at the jobsite.  (Tr. 40).

Henderson testified that he had carpal tunnel in his hands.  (Tr. 42).  He wore hand wraps

at night sometimes, soaked his hands when they bothered him, and used hand grips and a ball to

strengthen his hands.  (Tr. 42).  He also got a shot in his hand.  (Tr. 44-45).  Henderson also said

that he had pain in his lower back since 2014.  (Tr. 44).  He said that he was flat-footed, got an

injection in his foot, and used "basic gel" insoles and a boot because he stood all day for work.

(Tr. 44).  Henderson said that he took medication for hypertension and used a CPAP for sleep

apnea.  (Tr. 41-42, 46).  Henderson had anger issues, which were triggered by "disrespect."  (Tr.

45).  Henderson said that he was going to start anger management classes the Wednesday after

the hearing, and he had gone to counseling in the distant past.  (Tr. 45).  When asked how he

would respond if he felt disrespected at his cook job, Henderson said that he had been trying to

step away, take breaths, talk to his higher power, and try to bear with it.  (Tr. 46).  Henderson also said that he had anxiety and slept three hours each night.  (Tr. 47).

Henderson testified that he had several surgeries in 2015 and 2016 for his gluteal abscess. (Tr. 49).  He said that his abscess was "so painful" that he did not believe he would have been able to work full-time in 2016.  (Tr. 49).  He said that it took a few days after his surgeries before he was able to sit.  (Tr. 49).  He said that he spent almost all of 2016 in pain, and he would lie on his stomach and drool sometimes.  (Tr. 50).  Henderson said that, after his last surgery, he had no issues, but he was still fearful that an abscess could come back.  (Tr. 50).  He also said that he was going to have a colonoscopy to determine whether he had Crohn's disease.  (Tr. 49).  At the end of Henderson's testimony, the ALJ asked Henderson if he had anything further to state that neither the ALJ nor counsel had asked him about.  (Tr. 51).  Henderson said, "No, I don't think so, sir."  (Tr. 51).

Eric Dennison, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 52-58). The VE testified that a hypothetical individual with Henderson's age, experience, education, and RFC could not perform his past work as a construction worker but could work as a checker, garment sorter, or linen grader.  (Tr. 52-53).  The VE testified that, if such an individual would need breaks in excess of 20 percent of the workday or would be unable to complete two or more workdays per month, he would not be able to perform any jobs in the national economy.  (Tr. 58).

## IV.    The ALJ's Decision

The ALJ made the following paraphrased findings relevant to Henderson's argument on judicial review:

3.  Henderson has the following severe impairments: lumbar spine disorder, sleep apnea, obesity, affective disorder, history of abscess removal, gastrointestinal disorder, and flat feet disorder.  (Tr. 22).

5.  Henderson has the residual functional capacity to perform light work, except occasional climbing of ladders, ropes, and scaffolds; frequent climbing of ramps and stairs; frequent crawling; limited to performing simple tasks and instructions; no fast-paced production requirements; infrequent changes in the workplace setting; and occasional interaction with coworkers and the general public.  Henderson alleged depression, high blood pressure, ADHD, low back pain, anal fissure, bipolar disorder, carpal tunnel syndrome in the right hand, sleep apnea, and arthritis in both hands.  Because of his conditions, he reportedly has difficulty lifting, squatting, remembering, completing tasks, concentrating, using his hands, and getting along with others.  Henderson's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, Henderson's statements concerning the intensity, persistence, and limiting effects of these symptoms are only partially consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.  Accordingly, these statements have been found to affect Henderson's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.  (Tr. 24-25).

Despite allegations of debilitating symptoms, Henderson did not appear in acute distress during medical appointments.  Physical examinations showed largely normal findings including normal respiratory, neurological, and gastrointestinal functioning, no edema in the extremities, normal gait, normal range of motion in the spine and lower extremities, intact muscular strength, and negative Romberg's sign.  During an internal medicine consultative evaluation, Henderson's physical functioning was within normal limits including intact gait, normal stability, normal neurological functioning, proper orientation, and normal speech.  During two psychological consultative evaluations, he displayed normal mental status except for poor judgment and aggressive affect.  Further rebutting allegations of debilitating symptoms are Henderson's robust activities of daily living.  He cares for his personal hygiene independently, prepares meals, drives a car, shops in stores, handles finances independently, watches television, spends time with his children, and goes to the park.  (Tr. 25-26).

In sum, the evidence partially supports Henderson's allegations.  Although Henderson has a history of abscess issues, it is not chronic in nature.  There was little medical treatment for it in 2016 and none in 2017.  As for Henderson's anger issues, it was not treated until recently.  Despite his physical and mental symptoms, he has been able to work as a cook. At the time of the hearing, he had been working consistently for 90 days.  Overall, the medical record documents largely stable mental and physical functioning.  For these reasons, the evidence partially supports Henderson's allegations and any limitations imposed by Henderson's impairments are accounted for sufficiently in the residual functional capacity.  (Tr. 27).

14

Based on all of his findings and testimony from the VE, the ALJ determined that Henderson had not been under a disability from June 23, 2014 through November 17, 2017.  (Tr. 22).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.       Sentence Six: New and Material Evidence[3]

Henderson argues that the court should remand his case pursuant to Sentence Six of 42 U.S.C. § 405(g), because new and material evidence could change the outcome of his case.  ECF Doc. 14 at 5-6, 10-11.  Specifically, Henderson asserts that he submitted to the Appeals Council 300 pages of medical records from MetroHealth Medical Center detailing his treatment for abscess issues in 2016, but the Appeals Council lost them.  ECF Doc. 14 at 5, 10-11.  Henderson contends that he requested the records from MetroHealth a second time, but he did not receive them until after the Appeals Council denied his request for review.  ECF Doc. 14 at 5-6 & n.1. He argues that his new records are material because: (1) they reveal that there was consistent treatment for abscesses in 2016; and (2) they might support a finding that he met or medically equaled the criteria for Listing 8.04 (chronic infections of the skin or mucous membranes).  ECF Doc. 14 at 11.

The Commissioner responds that, because Henderson did not submit his new medical records to the court, he cannot meet his burden to show that his evidence is new and material, and he has deprived the court and the Commissioner of the ability to address it.  ECF Doc. 16 at 6.  The Commissioner also asserts that Henderson has not shown "good cause" excusing the failure to incorporate the evidence into the prior administrative proceeding because: (1) he did not provide any specific dates regarding when he requested and allegedly submitted the evidence; (2) he did not request the 2016 records until around April or May 2017; (3) he did not describe any follow-up efforts to obtain the records during the alleged 6-month period between

---

[3] The court must address the Sentence Six remand issue first because, if such a remand were granted, the court would not be permitted to affirm, modify, or reverse the Commissioner's decision.  *See Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

when he requested them and when they were received; and (4) he did not detail any efforts to inform the ALJ of the outstanding records or to ask that the record be held open. ECF Doc. 16 at 7. Further, the Commissioner argues that, despite alleging that the Appeals Council lost his records, Henderson admitted that he had provided the wrong social security number with them. ECF Doc. 16 at 6.

Henderson's reply brief reiterates the arguments made in his initial brief. ECF Doc. 17 at 1-3. Henderson also argues that the Commissioner's statement that he had included the wrong social security number for his medical records misrepresents the record. ECF Doc. 17 at 2. Instead, he asserts that the Appeals Council lost his entire appellate record, the correct social security number appeared on the proof of mailing and copies of his request for review and letter brief that he faxed to the Appeals Council in February 2019, and the incorrect social security number appeared only in a follow-up fax that he sent the Appeals Council in March 2019. ECF Doc. 17 at 2. Henderson also included with his reply brief: (1) 785 pages of MetroHealth medical records dated March 18, 2016, through November 23, 2019 (ECF Doc. 17-2); (2) a May 31, 2017 letter requesting medical records from MetroHealth (ECF Doc. 17-1 at 1); and (3) an August 11, 2017 letter following up on the May 31, 2017 request (ECF Doc 17-2 at 2). Henderson contends that the court should order the Commissioner on remand to consider the records through "November 2017" (ECF Doc. 17-2 at 1-447), and that his letters demonstrate that he followed up on his records request. ECF Doc. 17 at 2.

### 1. Sentence Six Standard

A court may remand a case for the Commissioner to consider newly discovered evidence pursuant to Sentence Six of 42 U.S.C. § 405(g). To obtain such a remand, the claimant must show that: (1) the evidence is new; (2) the evidence is material; and (3) good cause excuses the claimant's failure to incorporate the evidence into the record of a prior administrative

proceeding.  42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  "New evidence" is evidence that did not exist or was not available to the claimant at the time of the administrative proceeding.  *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990).  To be material, the evidence must be: (1) chronologically relevant, *i.e.* reflect upon the claimant's condition during the relevant period; and (2) probative, *i.e.*, have a reasonable probability that it would change the administrative result.  *See Casey*, 987 F.2d at 1233 (holding that a claimant's new evidence was not material because it did not show a "marked departure from previous examinations" and it "pertain[ed] to a time outside the scope of our inquiry"); *accord Winslow v Comm'r of Soc. Sec.*, 556 F. App'x 418, 422 (6th Cir. 2014).  And the Sixth Circuit takes a "harder line" approach to good cause – a claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing, but must establish good cause for why he did not cause the evidence to be created and produced until after the administrative proceeding.  *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001).  Moreover, when the evidence was available before the Appeals Council declined review, the claimant must explain why he did not submit that evidence to the Appeals Council.  *Cf. Lee v Comm'r of Soc. Sec.*, 529 F. App'x 706, 717 (6th Cir. 2013) (finding that a claimant did not show good cause when, *inter alia*, the claimant did not submit April 2011 evidence when the Appeals Council received additional evidence in August 2011).

### 2.  Forfeiture

As an initial matter, the court must determine whether this issue is properly before the court when Henderson failed to include with his initial brief the "new evidence" for which he seeks a Sentence Six remand, but included the evidence and citations to it in only his reply brief.

Even when raised in an initial brief, an argument may be forfeited[4] when its proponent fails to accompany the argument with developed argumentation – *i.e.*, citations to governing law and citations to the evidence supporting the argument.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.' *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995).");  *see also NCUA Bd. v. Zovko*, 728 F. App'x 567, 569 (6th Cir. 2018) (argument "waived" when its proponent included only one legal citation and no citations referencing any supporting evidence resulted).  And the attempt to later develop an argument in a reply brief is considered to be too little, too late.  *See Colvin v. Comm'r of Soc. Sec.*, No. 4:18cv1249, 2019 U.S. Dist. LEXIS 168743, at *11 (N.D. Ohio Sept. 30, 2019) ("Plaintiff's attempts to more fully develop [his] argument in his reply brief comes too late, as it is well-established that new substantive issues cannot be raised in a reply brief.");  *see also Bose v. Bea*, 947 F.3d 983, 993 (6th Cir. Jan 28, 2020) (holding that "any attempt to develop" an argument in a reply brief "was too late").  This is because, by failing to adequately develop an argument in his initial brief, the proponent of that argument deprives his opponent of the ability to respond to it.  *Cf. United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) ("'It is impermissible to mention an issue for the first time in a reply brief because the appellee then has no opportunity to respond.'  *Knighten v. Comm'r*, 702 F.2d 59, 60 n.1 (5th Cir. 1983).").

---

[4] "[F]orfeiture is the failure to make a timely assertion of a right" or argument.  *See United States v. Olano*, 507 U.S. 725, 733 (1993) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), and *Freytag v. Comm'r*, 501 U.S. 868, 894 n.2 (1991)(Scalia, J., concurring)) (distinguishing "forfeiture" from the related concept of "waiver").

Although Henderson *raised* his Sentence Six argument in his initial brief, his failure to submit his "new evidence" with his brief or allege any specific dates regarding when he requested or received the "new evidence," left his argument undeveloped and forfeited.  *See McPherson*, 125 F.3d at 995-96; *Citizens Awareness Network, Inc.*, 59 F.3d at 293-94; *NCUA Bd.*, 728 F. App'x at 569.  As the Commissioner noted in his response brief, Henderson's failure to include his new evidence with his merits brief deprived the Commissioner of the ability to adequately respond to his Sentence Six argument.  ECF Doc. 16 at 6; *see also Jerkins*, 871 F.2d at 602 n.3; *Knighten*, 702 F.2d at 60 n.1.  Specifically, because the Commissioner did not have access to Henderson's "new evidence," the Commissioner could not include in his response brief an argument evaluating whether Henderson's "new evidence" was material.  ECF Doc. 16 at 6; *Casey*, 987 F.2d at 1233; 42 U.S.C. § 405(g).  Similarly, Henderson's failure to include in his initial brief any specific dates regarding when he requested and first received his "new evidence" impaired the Commissioner's ability to include in his response brief an adequate evaluation of whether "good cause" excuses the failure to incorporate the evidence at an earlier time.  ECF Doc. 14 at 11 (stating only that he requested the records "several months before" the ALJ hearing and received them "over three months" after it); *Perkins*, 14 F. App'x at 598-99; 42 U.S.C. § 405(g).  And, although Henderson attempted to remedy his forfeiture by including his "new evidence" with his reply brief and alleging more-specific dates, his efforts came too late. *Colvin*, 2019 U.S. Dist. LEXIS 168743, at *11; *Bose*, 947 F.3d at 993; ECF Doc. 17; ECF Doc. 17-1; ECF Doc. 17-2.

Accordingly, I recommend that Henderson's request for a Sentence Six remand be DISMISSED as forfeited.

### 3.    Merits

Even if the court were to review Henderson's Sentence Six argument on the merits, it would still fail.  Of the 447 pages of "new evidence" for which Henderson seeks a remand, the records in pages 440-47 are not chronologically relevant to Henderson's claim because those pages include only medical records detailing his condition on November 27, 2017 – 10 days *after* the relevant period.  *See* ECF Doc. 17-2 at 440-47; (Tr. 29); *Casey*, 987 F.2d at 1233.  Thus, the medical records in pages 440-47 of Henderson's "new evidence" (ECF Doc. 17-2) are not material and cannot justify a Sentence Six remand.  *Casey*, 987 F.2d at 1233; 42 U.S.C. 405(g).

The remaining medical records (pages 1-440) are material.  These records are chronologically relevant because they detail his condition from March 18, 2016 through November 10, 2017 – all dates falling within the relevant period.  ECF Doc. 17-1 at 1-439; (Tr. 29); *Casey*, 987 F.2d at 1233.  They are also probative.  *Casey*, 987 F.2d at 1233.  These medical records Henderson's treatment – including for abscesses – during much of 2016 and the part of 2017 leading up to the ALJ's decision.  ECF Doc. 17-2 at 1-439.  Because the ALJ's RFC analysis and rejection of abscess-based limitations was – at least in part – premised on the ALJ's conclusion that "[t]here was little medical treatment for [abscess issues] in 2016 and none in 2017," the inclusion of these records could reasonably be expected have yielded a different result.  (Tr. 27); *Casey*, 987 F.2d at 1233.

But these records are not "new."  Because Henderson's March 2016 through November 10, 2017 medical records all existed before the ALJ issued his November 17, 2017 decision, whether the evidence is "new" hinges on whether it was *available to Henderson* during the administrative proceedings.  *Finkelstein*, 496 U.S. 617, 626.  Henderson has not said on what specific date he first received the MetroHealth records but has said only that he received them "over three months post-hearing."  ECF Doc. 11 (citing (Tr. 209).  This non-specific timeline is

not sufficient to meet his burden on Sentence Six review and, arguably, leaves his argument

undeveloped and forfeited.  *See McPherson*, 125 F.3d at 995-96.  Nevertheless, even if the court

accepted the "over three months" timeline, Henderson would have initially received the records

sometime between October 5, 2017 and November 5, 2017 (after which the assertion would be

that at least *four* months – not *three* – had passed after the hearing).  ECF Doc. 11 (citing (Tr.

209); *see also* (Tr. 39) (hearing held on July 5, 2017).  Thus, accepting Henderson's alleged

timeline directs the conclusion that the records were available to Henderson approximately 12 *or*

*more* days *before* the ALJ issued his November 17, 2017 decision.  (Tr. 29).  Therefore,

applicable law requires us to conclude that Henderson's "new evidence" is not "new."

*Finkelstein*, 496 U.S. 617, 626.

      Henderson also has not shown "good cause" for why he failed to make the records

available to the ALJ while his claim remained pending before the ALJ.  As discussed above,

accepting Henderson's alleged timeline of events directs a conclusion that he received the

MetroHealth records *sometime* between October 5 and November 5, 2017.  *See* ECF Doc. 11

(citing (Tr. 209).  Yet, Henderson has offered *no* explanation why he did not try to get the

records to the ALJ before the ALJ issued his November 17, 2017 decision.  *See generally* ECF

Doc. 14; ECF Doc. 17.  And, even if the court were to assume that some greater time than

Henderson has alleged had passed before he received the records, he still could not show "good

cause" under the Sixth Circuit's "harder line" approach.  *Perkins*, 14 F. App'x at 598-99.  The

documents attached to Henderson's reply brief show that he did not request the medical records

at issue until May 31, 2017[5] and did not send a follow-up letter seeking the requested documents

until August 2017 (after the hearing).  ECF Doc. 17-2 at 1.  At the time he initially requested

---

[5] Also, May 31, 2017 is *less than one week* over *one month* before the July 5, 2017 ALJ hearing – making his allegation that he requested the records "*several* months" before the hearing questionable at best.  *See* ECF Doc. 14 at 11 (citing (Tr. 209)).

these documents, his claims had been pending for over 2 years, his request for an ALJ hearing had been pending for over a year, and the 2016 records had existed for at least five months (nearly the same amount of time he says it took MetroHealth to respond to his request).  ECF Doc. 17-1 at 1-292; (Tr. 168-69, 212-24).  Yet, Henderson has offered no explanation for why he did not request the records earlier or try to follow up with MetroHealth *before* the hearing.  *See generally* ECF Doc. 14; ECF Doc. 17.  Moreover, nothing in the Administrative Transcript or Henderson's briefs indicates that he alerted the ALJ that a records request remained outstanding or asked that the record be left open while the request remained pending.  *See generally* ECF Doc. 12; ECF Doc. 14; ECF Doc. 17.  And these are precisely the kind of shortcomings that the Sixth Circuit has held precluded a claimant from showing "good cause" for a Sentence Six remand.  *See*, *e.g.*, *Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852, 859 (6th Cir. 2003) (finding a claimant did not show "good cause" for a Sentence Six remand when she had "months to prepare for the hearing," "could have sought the [records] earlier or done something more than wait for them to arrive in the mail," and "could have notified the ALJ that additional evidence was forthcoming and sought a continuance for that reasons"); *accord Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149 (6th Cir. 1996).

In sum, I find: (1) that Henderson's "new evidence" is either not chronologically relevant (ECF Doc. 17-2 at 440-47) or not "new" (ECF Doc. 17-2 at 1-439); and (2) that he has not met his burden to show "good cause" for failing to make the evidence part of the record during the ALJ's proceedings.  Accordingly, should the Court decline to dismiss Henderson's Sentence Six argument as forfeited, I recommend that Henderson's request for a Sentence Six remand be DENIED.

C.      **Step Four: Subjective Symptom Complaints**

Henderson next argues that the ALJ's "credibility determination" was not supported by substantial evidence.  ECF Doc. 14 at 12-13.  Henderson asserts that the ALJ improperly relied on "one questionnaire" to conclude that Henderson was able to perform "robust activities of daily living," and that such conclusion did not reflect the evidence in the record, particularly when the ALJ did not follow up on the questionnaire during the hearing and developed no evidence concerning the frequency or extent to which Henderson engaged in them.  ECF Doc. 14 at 12-13.  Henderson also contends that his testimony that he was in pain through much of 2016 and his new evidence from MetroHealth demonstrated that he was more limited, unable to perform light work, and unable to perform any sustained work "for 2016 at least."[6]  ECF Doc. 14 at 13.  Further, he argues that the ALJ's failure to reach a conclusion supported by substantial evidence was not harmless because the VE testified that an individual who would needed breaks for 20% of the workday or who would miss more than two days of work per month could not perform any substantial gainful activity.  ECF Doc. 14 at 13.

The Commissioner responds that substantial evidence supported the ALJ's conclusion that Henderson's statements about the intensity, persistence, and limiting effects of his impairments were only partially consistent with the other evidence in the record.  ECF Doc. 16 at 8-11.  The Commissioner argues that the ALJ properly relied on the normal findings in the medical record, Henderson's questionnaire answers about his daily living activities, and evidence that he was able to work full time as a cook for the three months preceding the hearing.  ECF Doc. 16 at 9-11.  The Commissioner also asserts that the ALJ was not required to inquire further regarding Henderson's questionnaire answers, especially when Henderson was represented by

_____

[6] Henderson seems to concede that he was able to return to work in 2017; and, as noted above, he actually had been working as a cook for the ninety days preceding the ALJ hearing.

counsel at the hearing.  ECF Doc. 16 at 10.  Further, the Commissioner contends that

Henderson's new medical records are not relevant to this court's substantial evidence review.

ECF Doc. 16 at 10 n.5.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by

considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).

Henderson argues again in this section of his brief that the Commissioner failed to consider the

"new" evidence from his 2016-2017 medical care.  But the ALJ could not consider evidence not

before him.  And, as discussed in the prior section of this R&R, Henderson has not laid the

necessary foundation for a Sentence Six remand based on his contention that the Commissioner

erred in not accepting and considering Henderson's "new" evidence.  Because this issue has been

fully discussed above, I will not repeat that analysis here.

"In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of

an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider

in conducting this analysis.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*,

874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may

support a claim of disability.").

Before March 2016, the Social Security Administration characterized the evaluation of a

claimant's subjective symptom complaints as a "credibility" determination.  *See* SSR 96-7p,

1996 SSR LEXIS 4 (July 2, 1996).  In SSR 16-3p, the Social Security Administration that this

characterization did not accurately reflect the language in the regulations and eliminated the term

"credibility" from its sub-regulatory policy.  SSR 16-3p, 2016 SSR LEXIS 4 (Oct. 25, 2017).

The Social Security Administration explained that "subjective symptom evaluation is not an

examination of an individual's character," but is instead an examination of the subjective

complaints' consistency with other evidence in the record. SSR 16-3p, 2016 SSR LEXIS 4 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

In conducting this *consistency* analysis, an ALJ is not required to accept the claimant's complaints at face value but may discount them based on several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Jones*, 336 F.3d at 475–76 ("[A]n ALJ is not required to accept a claimant's subjective complaints."); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). The ALJ need not exhaustively discuss each of these factors or all of the evidence in the record but need only acknowledge the factors and discuss the evidence that supports his decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ applied proper legal standards in evaluating Henderson's subjective symptom complaints and assessing his RFC. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d t 241. The ALJ complied with the regulations by assessing Henderson's RFC in light of the medical evidence, his own testimony and questionnaire answers, and other evidence in the record. 20

C.F.R. §§ 404.1520(e), 416.920(e); SSR 96-8p, 1996 SSR LEXIS 5.  The ALJ did not assess whether Henderson's subjective complaints were credible – which would have been improper – as Henderson contends.  (Tr. 24-25); ECF Doc. 14 at 12-13.  Instead the ALJ complied with SSR 16-3p by explaining that Henderson's subjective complaints concerning the intensity, persistence, and limiting effects of his symptoms were not *consistent* with other evidence in the record.  (Tr. 24-25); SSR 16-3p, 2016 SSR LEXIS 4.  In doing so, the ALJ properly considered and relied on Henderson's questionnaire answers regarding his ability to perform day-to-day activities without significant limitations.  *Temples*, 515 F. App'x 460, 462.  And Henderson has not pointed to any authority requiring an ALJ to challenge or further question at the hearing a claimant's function report statements about his daily living activities – especially when the claimant is represented by counsel at the hearing, counsel had the opportunity to question the claimant, and the claimant declined when the ALJ gave him an opportunity to make any additional statements.  (Tr. 46-51); *see generally* ECF Doc. 14; ECF Doc. 17; *see also Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 549 (6th Cir. 2002) (citing *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988) ("[A]n ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case.")).

Substantial evidence also supports the ALJ's conclusions regarding Henderson's subjective symptom complaints and RFC.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d t 241; *Biestek*, 139 S. Ct. at 1154.  Substantial evidence supported the ALJ's conclusion that Henderson had described "robust activities of daily living" and that his subjective complaints were inconsistent with other evidence in the record, including: (1) Henderson's function report statements that he was able to walk "far," could take care of all his household chores, could play video games and watch TV, often went outside and to the park, often drove, often shopped in stores, could prepare his own meals daily, could pay attention, and could follow written

instructions; (2) Henderson's testimony that he was able to work full-time as a cook, which was mostly standing work; (3) the general lack of psychiatric care in his medical records, despite numerous referrals from Dr. Daprano; (4) generally normal examination findings indicating that he retained full motor function and range of motion notwithstanding his various symptoms; (5) examination findings indicating that Henderson reported "feeling better" or finding that he was "well healed" after treatment for his abscess; (6) the state agency consultants' mild to moderate psychological findings; and (7) Dr. Bertani's opinion that Henderson could lift up to 20 pounds, stand or walk for up to 6 hours in a workday, and sit for up to 6 hours in a workday. (Tr. 38-41, 87-91, 122-23, 126-27, 312-16, 383-84, 391, 425-26, 437, 440, 445, 460-61, 474-75, 483-84, 519, 522, 524-25, 551, 553-54, 581-82, 613, 653, 697-98, 708, 714, 719, 725, 747-54, 759, 768-69, 772).  The same evidence supported the ALJ's ultimate RFC finding.  (Tr. 24). And, even if other evidence in the record or even a preponderance of the evidence in the record, could have supported a different conclusion, this court cannot overturn the ALJ's decision when substantial evidence supported it.  *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Because the ALJ applied proper legal standards and his conclusions were reasonably drawn from the record, the ALJ's evaluation of Henderson's subjective symptom complaints and ultimate RFC assessment fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Accordingly, I recommend that the ALJ's subjective complaint analysis, RFC analysis, and decision denying Henderson's applications for DIB and SSI be affirmed.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, and because Henderson has not met his burden to show that a Sentence Six

remand would be appropriate, I recommend that the Commissioner's final decision denying

Henderson's applications for DIB and SSI be AFFIRMED.

Dated: November 24, 2020

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).